A96A1722. FINCIT COMPANY II v. HARDIN et al.
(483 SE2d 609)

Judge Harold R. Banke.

Fincit Company II ("Fincit"), a lender, sued Allen Hardin, Earl Shell, Jr., Edward Albright, Jr., Jon E. Benson, James W. Bolding, W. James Overton, and W. Park McNair ("Hardin" collectively), general partners in Hardin Investment Associates XII ("Hardin XII") and senior employees of Hardin Construction Group, Inc., alleging fraud and breach of loan documents. After the trial court granted Hardin's motion for summary judgment, Fincit appealed.

To prevail on summary judgment, the moving party must show that no genuine issues of material fact remain to be tried and that the undisputed facts, viewed in the light most favorable to the non-movant, warrant summary judgment as a matter of law. *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). Viewed in that light, the evidence reveals that Covenant Development Company ("Covenant"), a marketer and developer of retirement communities, bought the real property at issue in October 1986. Fincit financed this purchase by lending Covenant $3.55 million. In exchange, Covenant gave Fincit a promissory note and a security deed.

The terms of the note required Covenant to obtain at least 150 pre-construction contracts for the purchase of condominiums on the property with accompanying ten percent earnest money deposits. Construction depended upon Covenant securing the pre-sales within a time certain and locating a lender willing to make a construction loan. If both were accomplished, the loan documents required Fincit to subordinate its security deed in favor of the construction lender. Failure to obtain the necessary pre-sales and financing meant the project was not viable, resulting in the return of the earnest money and Fincit's recovery of the loan from Covenant or foreclosure on the property.

A month after this transaction, Covenant, Hardin XII, and Cecil Phillips, a financier, formed another general partnership, Decatur Retirement Group ("Decatur Retirement"), with the intention of transforming the land Fincit financed into a retirement condominium community called Clairmont Place.[1] Covenant then assigned the loan to Decatur Retirement, and quitclaimed its interest in the property at issue to Decatur Retirement.

In January 1987, Decatur Retirement informed Fincit that it had obtained 159 pre-sales and was negotiating with construction lenders. Six months later, Hardin XII learned that Covenant had not placed the pre-sale purchasers' deposits into an escrow account and had spent at least some of the deposits.[2] Hardin XII responded by ordering an investigation by several Hardin Construction Group employees in June 1987 to determine how much deposit money had been spent. The parties dispute whether this investigation also exposed even greater financial problems including illegal side contracts involving the pre-sale agreements about which Fincit was not apprised. This dispute arose in part because appellee Benson gave, but subsequently attempted to withdraw, testimony that in the

---

[1] Hardin XII was formed solely for the purpose of investing in Decatur Retirement. Hardin Construction Group, Inc. ("Hardin Construction Group") was to build the project.

[2] Covenant's principals were convicted of embezzlement and securities violations in connection with a retirement community project in North Carolina.

spring of 1987 he developed concerns about the legitimacy of the pre-sales contracts and learned that 25 percent of the pre-sale documents, all of which were for investor units, were missing. In any event, in July 1987 Hardin XII informed Fincit's president of the escrow discrepancies and diverted escrow funds. Shortly after the meeting, Fincit declared a default on its loan and threatened to foreclose on the project, but Hardin XII and Phillips purportedly convinced it not to do so.

However, in July 1987 Hardin XII also decided to limit its own liability on the project. To that end, its partners formed two corporations, into which Hardin XII's general partners assigned their interest in Hardin XII, thereby replacing Hardin XII's general partners with two corporations, HIA I, Inc. and HIA II, Inc.[3] Hardin XII subsequently decided to withdraw from the Decatur Retirement project entirely by assigning its interest to Clairmont Properties, Inc. in December 1987. However, Hardin Construction Group continued as the project's contractor.

In January 1988, Mutual Life Insurance Company of New York ("MONY") loaned Decatur Retirement approximately $23 million to cover the construction of Clairmont Place and received a security deed to the property in return. During this same transaction, Covenant and Phillips assigned their interests in the Decatur Retirement project to Fincit.

On January 13, 1988, Fincit executed a release and covenant not to sue discharging Hardin XII and its "affiliates" from "any and all now existing claims, demands, actions, causes of action, suits, liabilities, indebtedness, duties, obligations and responsibilities, of any kind or nature, whether known or unknown, direct or indirect, joint or several, absolute or contingent, due or to become due." As consideration, the release stated that Hardin XII had transferred its interest in the project to Clairmont Properties, Inc., which had made certain unspecified financial accommodations inuring to Fincit's benefit. At the time this transaction occurred, Hardin XII purportedly already had divested its interest in the project. It appears that questions of fact may remain as to the effect of the release in light of these changes in parties.

At some disputed point either before or after the execution of the release, one of Hardin Construction Group's executives learned from the architect who designed Clairmont Place that there were some discrepancies in the pre-sale list. After the architect introduced Michael Vollmer, a former Covenant employee with knowledge of

---

[3] HIA I, Inc. consisted solely of appellees Hardin and Shell, while HIA II, Inc. included the remaining appellees.

these discrepancies, to a Hardin Construction Group executive, Vollmer began to investigate these matters for Hardin. Vollmer discovered that Covenant had misappropriated over $800,000 in escrow deposits in addition to the previously discovered escrow problems. He also learned that of the 162 units purchased, 42 had been sold at substantial discounts to investors who intended to rent out the units. Some of these investors did not intend to close and were guaranteed a certain rate of return on their deposit, a fact which transformed their investments into liabilities. It is undisputed that at least some of these transactions constituted illegal sales of unregistered securities. Fincit maintains that Hardin knew of and failed to reveal these illegal side agreements during the initial accounting in the summer of 1987.

A Hardin Construction Group executive arranged for a meeting with Fincit in February or March 1988 to discuss these discoveries. It is undisputed that within weeks after agreeing to the release, Fincit learned of the illegal pre-sales and the additional funds Covenant misappropriated.

The project failed and MONY foreclosed in June 1991. As a result, Fincit lost the entire amount of the loan.

In October 1992, Fincit's president telephoned Vollmer and purportedly learned that Hardin XII knew of the illegal pre-sales before the release was executed. Fincit then initiated this action alleging that Hardin fraudulently misrepresented and concealed the fraudulent pre-sales until Fincit executed the release. The trial court granted Hardin's motion for summary judgment, finding that the release was binding and the fraud claim was time-barred because Fincit learned of the alleged fraud in March 1988. *Held:*

1. Because Fincit raised genuine issues of material fact about when Hardin XII learned about the illegal pre-sales, summary judgment was inappropriate. Proof that Hardin XII acquired this knowledge before Fincit executed the release but misrepresented the number and legitimacy of the pre-sale contracts could render the release voidable and toll the statute of limitation, provided Fincit exercised due diligence. See *Tower Financial Svcs. v. Jarrett*, 199 Ga. App. 248, 250 (2) (404 SE2d 622) (1991); OCGA §§ 9-3-96; 13-4-60; 13-5-5.

The primary factual predicate for Fincit's fraud allegation is Fincit's president's testimony that between August and September of 1987 two Hardin XII partners verified to Fincit that all the pre-sale contracts were real and in place, when, in fact, many of them were invalid or illegal.

Statements of Larry Rupe, one of Covenant's principals, raise genuine issues of fact. Rupe attested that he participated in a meeting at Hardin XII's offices in the summer or early fall of 1987 in which certain Hardin XII partners voiced concerns about the legality

of the investor contracts and sought to limit Hardin XII's liability. Although Rupe's deposition testimony may be inconsistent with this statement, a jury must determine his credibility. In addition, both Benson and the project's architect (in a deposition from another case) gave equivocal testimony on when Hardin XII learned of the illegal pre-sale contracts. Because the issues of fraud and due diligence raised here are disputed, a jury should decide them. *Blanchard v. West*, 115 Ga. App. 814, 815 (2) (156 SE2d 164) (1967).

We reject Hardin's contention that the statute of limitation began to run when it informed Fincit of pre-sale problems in the winter of 1988. At that point, the statute indisputably began to run on Covenant's fraud, which related to the construction project itself. But Fincit's claims against Covenant are separate and distinct from those alleged against Hardin. Questions of fact remain as to whether the limitation period on Hardin's alleged fraud, which goes to Hardin's alleged misrepresentation and concealment of the full extent of Covenant's fraud in order to induce Fincit to rescind default, continue with the project, and execute the release, commenced at that time. OCGA § 9-3-96.

2. Nor does the statute of limitation bar Fincit's claim for breach of the loan agreement. Instruments under seal, like the agreement on which Fincit's loan claim is based, have a 20-year statute of limitation. OCGA § 9-3-23. If it is determined that the release is voidable, then the contract claim is viable.

3. Having decided to reverse on other grounds, we observe that the trial court effectively precluded Fincit from including Vollmer's deposition in the record. The trial court granted Fincit's motion to compel Vollmer's deposition, finding him a "crucial witness." Days later, however, without considering his testimony, the court granted Hardin's motion for summary judgment. Because the record shows that Vollmer's actions were integral and potentially dispositive to some of the facts at issue, it is not unreasonable to conclude that his cross-examination testimony would have been relevant. Compare *Tuck v. Marriott Corp.*, 187 Ga. App. 567, 569 (2) (370 SE2d 795) (1988). The grant of summary judgment under these circumstances generally is not condoned. See id.

*Judgment reversed and case remanded for further proceedings. Andrews, C. J., and Smith, J., concur.*

DECIDED FEBRUARY 19, 1997 —
RECONSIDERATION DENIED MARCH 6, 1997 — ▮▮▮▮▮▮

*Appel, Chitwood & Harley, Martin D. Chitwood, Craig G. Harley,* for appellant.

*Kilpatrick & Cody, William H. Boice, Craig E. Bertschi, Tim Carssow,* for appellees.